# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF FLORIDA

## IN ADMIRALTY

HUNTINGTON NATIONAL BANK,

      Plaintiff,

v.

M/Y SOMETHING ABOUT MERI, her engines,

machinery, tackle, apparel, boats, furniture,

equipment, rigging, freights, and all other

necessary appurtenances, etc., in rem, and

STANLEY R. KALISH, in personam,

      Defendants.

Case No. 0:25-cv-61018-WPD

_____/

FILED BY _____ D.C.

MAY 20 2026

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S.D. OF FLA. – W.P.B.

## POST-CONFIRMATION MOTION TO VACATE CONFIRMATION OF SALE TO HUNTINGTON NATIONAL BANK PURSUANT TO LOCAL ADMIRALTY RULE E(17), BASED ON FRAUD, MISREPRESENTATION, CONCEALMENT, MATERIAL IRREGULARITY, LACK OF NOTICE, NEWLY DISCOVERED EVIDENCE, AND REQUEST FOR NEW AUCTION

Interested party Danielle Morron, present at the April 21, 2026 Marshal Auction of the 2005 Mangusta 92 "Something About Meri" at the Broward Federal Courthouse, hereby moves to vacate the confirmation of sale at DE 323 to Huntington National Bank.

This is a post-confirmation motion and is therefore directed to the type of extraordinary sale defects that justify relief after confirmation: fraud, misrepresentation, concealment, material irregularity, lack of notice, and conduct that prevented the judicial sale from operating as a fair, open, and transparent Marshal sale. This motion is based on newly discovered or newly disclosed facts about the high bidder Dr Pano Churchill's tender of funds, communications with the bank and its attorneys, lack of service, and the absent report.

This motion explicitly concerns confirmation/sale integrity at DE 323, and asks the district court to police the integrity of its own judicial sale process; it does not ask the district court to reverse DE 293's voluntariness ruling, which is currently pending on appeal in the Eleventh Circuit.

Movant does not contend that credit bids are always illegal. Credit-bid confirmation became improper here because it followed an irregular alleged default, the absence of a Marshal's report, no certificate of service reflecting notice to the high bidder, an unadjudicated credit-bid amount subject to material offsets for custodial damage, use or impairment of the Vessel during custody, and credits affecting the amount actually secured by the mortgage debt, all while leaving no cash substitute res.

Local Admiralty Rule E(17)(e) required the Marshal, "at the conclusion of the sale," to "file and serve a written report of the sale" identifying the date of sale, price obtained, and name and address of the buyer. The record does not show that any such Marshal sale report was docketed or served on

**Dr Pano Churchill**
**233 SW 186th Street**
**Normandy Park, WA 98166**
**650-656-3939**
**DrChurchill@ALSVC.com**

before his alleged default was adjudicated. This omission is material because Huntington invoked E(17)(d), which required the Court to exercise discretion between confirming to the second-highest bidder and ordering a new sale. That discretion could not be meaningfully exercised without the E(17)(e) sale report or an equivalent transparent record of the high bidder's identity, bid amount, deposit/tender facts, and alleged default circumstances.

That is exactly why the report mattered. The Court needed a transparent sale/default record identifying the accepted high bidder, the bid amount, deposit issue, and default circumstances before deciding whether to confirm to the second-highest bidder or order a new sale under E(17)(d). The court does not appear to have received that information.

In a May 16, 2026 voice note voluntarily sent to Morron, Dr Churchill stated that after the auction he had "many conversations" with Huntington-side participants, including counsel, a banking executive, Frank Kups, Rupert Gregory, and Kenneth Galbrieth, concerning efforts "to come to terms and a deal." **See Exhibit A**. Dr Churchill further stated that he appeared with three certified checks of $19,000 each, totaling more than the required ten-percent deposit, but that the Marshal wanted one unified check for $50,000. Id. He also stated that he was not served and would not have known confirmation had occurred absent Morron notifying him. Id.

Morron does not seek relief on behalf of Dr Churchill or ask the Court to adjudicate his private contractual rights. Morron relies on the lack of docketed service to Dr Churchill, the absence of the required Marshal sale report, and Huntington's undisclosed communications with the high bidder as material defects in the judicial-sale process because Huntington used the alleged

default to obtain confirmation by credit bid, thereby eliminating cash registry proceeds and impairing Morron's ability to obtain meaningful appellate relief if the interlocutory order adjudicating voluntariness is reversed.

Local Admiralty Rule E(17)(d) does not expressly set out a separate notice procedure for a motion seeking default-based confirmation against the high bidder. But it also does not authorize ex parte adjudication of a disputed high-bidder default. The Rule gives the Court discretion to either award the sale to the second-highest bidder or order a new sale as appropriate. That discretionary choice required a transparent factual record and notice to the person whose alleged default supplied the basis for the requested relief.

Separately, Local Admiralty Rule E(17)(e) required the Marshal to file and serve a written report of sale identifying the date of sale, price obtained, and name and address of the buyer. No such docketed report or certificate of service shows that Churchill was served with the default-related filings before confirmation of sale to the second-highest bidder was approved.

This motion is based on the fact that Huntington obtained confirmation to itself by credit bid after asserting Dr Churchill's alleged default and failure to make the 10% deposit, while concealing from the Court and from Dr Churchill the material facts surrounding the subsequent allegations of default, including alleged inducement, concealment, or misleading communications by Nicholas Zeher, Marc Hoffman, and other Huntington-side participants that discouraged completion of payment through the Marshal or the Court registry and attempted to redirect payment through Huntington's attorneys.

No Marshal's report of sale was filed and served identifying Dr Churchill as the registered high bidder, stating the sale price, identifying his address and contact information, disclosing that he

appeared with certified funds exceeding the required deposit, explaining that three certified checks for $19,000 were presented to the Marshal, who reportedly asked for one reissued unified check of $50,000, or describing the disputed circumstances Huntington later characterized as a simple bidder default.

No record exists on the docket that Dr Churchill was served with any notice of default, motion for confirmation, or other paper advising him that Huntington intended to use his alleged default as the basis to obtain relief and confirmation of sale to itself using an unfixed credit bid subject to unadjudicated offsets for custodial damage and use of the vessel during the period of detention.

After the auction concluded, Dr Churchill was repeatedly contacted by representatives of Huntington, its counsel, and other persons acting in connection with the sale, including Frank Kups, Rupert Gregory, Connor Gilbraith, Nick Zeher, and Marc Hoffman. Those individuals communicated with Dr Churchill concerning payment, vessel condition, alleged undisclosed damage, sale irregularities, and alternative deal-structure terms. Those communications would reasonably lead Dr Churchill to believe the matter was being handled through internal channels at the bank's attorney's office, rather than through its double narrative simultaneously pursuing immediate default proceedings before the Court and characterizing him as a defaulting bidder.

Huntington therefore proceeded on two tracks. On one track, it communicated with Dr Churchill as though payment, condition issues, damage issues, and sale terms were being actively revised and adjusted to close the sale. On the other track, it sought confirmation from the Court to award the vessel to itself, using his alleged default as the basis for seeking confirmation as the "second-highest bidder," without serving him with notice that the bank's off-record settlement negotiations were being used as the factual predicate for transferring the vessel to Huntington.

That dual-track conduct, combined with the absence of a Marshal report, lack of service, omission of material facts regarding communications and bidder identity, and confirmation by credit bid, constitutes fraud, misrepresentation, concealment, or at minimum, the type of material irregularity that defeats the fairness and transparency required of a judicial sale in admiralty.

The absence of a Marshal's report was not merely a technical defect, because Huntington's entire confirmation theory depended on the existence and consequences of the alleged default.

## POST-CONFIRMATION STANDARD

After confirmation, a judicial sale is not lightly disturbed. Finality matters. However, finality does not protect a confirmation obtained through fraud, misrepresentation, concealment, lack of notice, or material irregularity that undermines the integrity of the sale process.

A confirmed judicial sale may be vacated where the confirmation was procured through conduct that deliberately prevented the Court from receiving a fair and accurate sale record, deprived the original auction winner of notice and an opportunity to be heard, and allowed the Plaintiff to benefit from a manipulated or non-transparent sale process.

This motion satisfies that standard. Huntington obtained confirmation to itself by relying on Dr Churchill's alleged default while failing to disclose the material circumstances surrounding the alleged default, failing to ensure that the Marshal filed and served the required sale report, failing to serve Dr Churchill with default-related filings, and simultaneously communicating with him in a manner that led him away from completing the sale through the Marshal, and leading him to believe that payment and closing terms were being redirected through bank counsel.

Because this is a post-confirmation request, relief in the form of a new, transparent auction is warranted, based on fraud, misrepresentation, concealment, lack of notice, and material irregularity in the judicial-sale process.

Former Fifth Circuit decisions issued before October 1, 1981 are binding precedent in this Court. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc). Under binding former Fifth Circuit admiralty-sale law, courts exercise "extreme caution" before disturbing judicial sales, but fraud, collusion, and comparable defects affecting the integrity of the sale process justify relief. *Wong Shing v. M/V Mardina Trader*, 564 F.2d 1183, 1188–89 (5th Cir. 1977).

That standard supports disturbing the relief granted to Huntington in this case. This motion does not ask the Court to set aside confirmation merely because an interested party objects to the result. It asks the Court to vacate a confirmation procured through a materially incomplete and grossly misleading default narrative, lack of service on the known registered high bidder, concealment of post-auction communications with Plaintiff's counsel Zeher and others concerning payment and alternative deal structure based on a grossly misrepresented vessel condition, and failure to place before the Court and on the record the Marshal sale report required by Local Admiralty Rule E(17)(e).

The concern is heightened because Huntington was not an unrelated good-faith third-party purchaser. Huntington was the foreclosing mortgagee-creditor and the party that seeks to benefit from the alleged default, which would circumvent cash proceeds being deposited in the registry and threaten to moot Morron's financial relief in the appellate court on the issue of voluntariness at DE 293. The former Fifth Circuit has recognized that when the mortgagee itself purchases the vessel, that fact "should alone have triggered the need for scrutiny." *Walter E. Heller & Co. v.*

*O/S Sonny V.,* 595 F.2d 968, 972 n.2 (5th Cir. 1979). Here, scrutiny was especially required because Huntington obtained the vessel by credit bid, after using Dr Churchill's alleged default as the predicate for confirmation, without the filing of a Marshal's sale report identifying the high bidder's name, bid amount, and contact details, and without serving the high cash bidder with any notice of default prior to seeking confirmation to itself.

## MATERIAL FACTS OMITTED FROM THE CONFIRMATION RECORD

The confirmation record omitted material facts necessary to determine whether Dr Churchill actually defaulted or whether the alleged default was induced, manufactured, or materially affected by Huntington-side communications and procedural irregularities.

Those omitted facts include:

1. Dr Churchill was the registered high bidder at the April 21, 2026 Marshal sale.

2. Dr Churchill bid $500,001.

3. Dr Churchill asserts he appeared with three certified bank checks in the amount of $19,000 each, totaling $57,000 and presented them to the Marshal for payment.

4. Those certified funds exceeded the ten-percent deposit required for his bid.

5. The deposit issue did not arise because Dr Churchill appeared with no funds. He alleges it arose because the certified funds were in multiple checks, and the Marshal asked for one unified check.

6. Dr Churchill alleges he raised concerns concerning vessel condition, undisclosed damage, auction transparency, and sale irregularities to the Marshal, who was then reluctant to take funds from him at all.

7. On the day of the auction, before reissuing the checks into a unified check for $50,000, Dr Churchill contends he received multiple communications from Frank Kups, Rupert Gregory, the bank representative, Connor Gilbraith, etc., in part, to come to terms on a deal.

8. Call records from Dr Churchill's phone demonstrate that prior to attorney Zeher filing DE 301 at 5:58 PM EDT on April 22, 2026 – Plaintiff's Motion for Extension of Time to File Response/Reply/Answer as to DE 300 – Order to Show Cause, Dr Churchill had already visited the Marshal's office and submitted identification information the day of the auction, and subsequently, spoke at length with plaintiff's counsel, Nicholas Zeher earlier that same day, April 22, for approximately 17 minutes, and then alleged to the court that more time was needed to respond to the court's order to show cause why a stay pending appeal should not be granted. "On information and belief, and based on communications involving the United States Marshal's Office, the Movant was in the process of gathering and verifying information concerning the individual who submitted the winning bid, including matters relevant to that individual's identity, representations made in connection with the auction, and the status of any required deposit." DE 301 at 2, ¶3, and further claimed that discovery of this allegedly unknown information was material to Movant's ability to meaningfully and accurately respond to the Motion persuant to the Court's directive in DE 300. Id at ¶4.

9. "Movant respectfully submits that this request is made in *good faith* and for the purpose of assisting the Court, *not for delay*." Id at ¶7, and, that "No party will be prejudiced by a brief extension."

10. In a voluntary voice note submitted to Morron, not recorded without Dr Churchill's consent, Dr Churchill contends that communications with the above named individuals in connection with the sale concerned alternative payment routing, post-sale vessel condition admissions

inconsistent with pre-sale representations and significant additional undisclosed damage, sale and bidder irregularities, and alternative deal structuring terms.

11. According to the public docket, a Marshal sale report containing the winning bidder - Dr Churchill's information was never filed.

12. According to the public docket, Dr Churchill was never served with notice of purported default.

13. According to the public docket and lack of corresponding certificate of service, Dr Churchill was never served with Huntington's motion seeking alternative confirmation to itself using an unliquidated credit bid in place of cash.

14. According to the public docket and lack of corresponding certificate of service, Dr Churchill was not given notice or an opportunity to appear in court, or explain the deposit issue alleged by the Plaintiff as a non-compliant bid, or discuss evolving deal structure terms perpetuated by plaintiff and its attorneys, brokers, and agents in post-auction communications in the seven days following the April 21 auction before his alleged default was used to attempt to award the vessel to Huntington.

15. Huntington obtained a confirmation of credit bid at DE 323 that is subject to yet unadjudicated offsets for physical custodial damages, and the distilled amount of the credit bid, which the court has already conceded at DE 285 at 11 does not equal the outstanding debt figure alleged by Huntington, has not yet been adjudicated.

These omissions were material. Had the Court known these facts, it should have questioned whether Dr Churchill's alleged default was genuine, induced, or procedurally defective. The court also failed to require a Marshal report. Given the serious discrepancies in the sale/default

process and the material information gaps left unresolved, the Court should have exercised its discretion to order a new sale, rather than confirming the vessel to Huntington.

## FRAUD, MISREPRESENTATION, AND CONCEALMENT

Huntington's request for confirmation to itself - without a Marshal's sale report, notice to the high bidder, or proof of service - rested on the representation that the high bidder, Dr Churchill, simply defaulted by failing to pay, and that Huntington, as the second-highest bidder, should receive the Vessel by credit bid. Huntington further argued that ordering a resale would expose the Vessel to continued deterioration and "the genuine risk, particularly given the Vessel's deteriorated condition, of a lower second round price" DE 313 at 2 ¶3. But that asserted risk does not eliminate the need for the Vessel to be liquidated at whatever price a market buyer is willing to pay. A properly noticed resale, free from Huntington's self-interested credit-bid maneuvering after it continued bidding against the sole cash bidder in $50,000 increments on an unquantified credit bid, would produce the very liquidity event Huntington ultimately seeks. Huntington is not a yacht dealer seeking market protection, and allowing it to acquire the Vessel by credit bid and then dispose of it privately at a lower price would not protect the estate. It would merely delay and obscure the true liquidity event, isolate any proceeds from the Court's registry, conceal the value actually realized, and deprive Morron of any substitute res if her appeal on voluntariness succeeds.

Neither Huntington nor the unfiled Marshal's report disclosed that Dr Churchill appeared at the Marshal's office on April 21 following the sale with certified funds exceeding the deposit requirement. Nor did they disclose that the alleged issue concerned the form of multiple certified bank checks; that Huntington-side participants communicated directly with Dr Churchill both before and after the auction; or that post-auction communications involved payment

modification, payment re-routing, and renegotiated sale terms based on the undisclosed "deteriorated condition of the vessel." Dr Churchill was not served with any papers or notice advising him that Huntington sought relief against him, including an order awarding the Vessel to Huntington based on his alleged non-performance, and he received no notice that Huntington moved exactly one week later to adjudicate his alleged default.

"The grounds recognized as justifying setting aside a sale include fraud, collusion, and gross inadequacy of price." *Wong Shing v. M/V Mardina Trader*, 564 F.2d 1183, 1188–89 (5th Cir. 1977). Huntington's collusive conduct regarding this auction and untruthful representations to this Court about the identity and continuous communications with the high bidder is precisely the kind of post-confirmation defect that falls outside the ordinary finality protection afforded to confirmed judicial sales.

*Wong Shing* protects fairly conducted sales from routine post-sale attacks; it does not protect a confirmation obtained through a materially incomplete record, concealment of facts bearing on the alleged default, or dual-track communications that led the high bidder away from completing payment through the Marshal while Huntington sought confirmation based on that alleged nonpayment without serving the winning bidder with any notice of the same.

Finality protects fair judicial sales; it does not immunize a confirmation procured through a materially incomplete default record.

Fraud or misrepresentation is not limited to an affirmative false statement. It also includes the omission or concealment of material facts necessary to prevent the Court from being misled. A party seeking confirmation of a judicial sale cannot present a simple "default" narrative while

omitting facts showing that the alleged default was induced, affected, or complicated by that party's own communications with the high bidder.

Huntington had superior knowledge of its communications with Dr Churchill. Huntington knew or should have known that Dr Churchill had ascertainable contact information because Huntington-side participants used that information to communicate with him. Huntington also knew or should have known that Dr Churchill was the person whose alleged default was being used to obtain relief, yet Huntington maintained two separate narratives: one presented to the Court, portraying Dr Churchill as an absent defaulting bidder of uncertain identity, and another maintained through direct communications and negotiations that kept Dr Churchill in the dark about Huntington's intent to use his alleged non-performance as the basis for confirmation to itself.

That concealment undermined the transparency of the public auction. Dr Churchill even had attorney James Perry speak to the bank's attorneys on his behalf, yet Huntington represented to this Court, for purposes of seeking confirmation, that it lacked knowledge of his identity. Huntington nevertheless pursued confirmation to itself while ensuring that Dr Churchill remained unserved, failed to notify him that his alleged default would be adjudicated, and failed to present a complete record of the post-auction communications to the Court.

That conduct warrants post-confirmation relief.

**MATERIAL IRREGULARITY IN THE MARSHAL SALE PROCESS**

The sale process also suffered material irregularity. Local Admiralty Rule E(17) contemplates a transparent sale process. Where a sale occurs, the Marshal's report is the formal mechanism by which the Court, parties, bidders, lien claimants, and interested persons can verify what occurred.

Here, the sale/default process proceeded without a Marshal's report identifying Dr Churchill as the high bidder, stating the price obtained, identifying his contact information, explaining the true nature of the deposit issue, or describing the circumstances that led to the alleged default.

That omission was not harmless. Huntington sought relief under the bidder-default procedure, so the Court needed a reliable default record before adjudicating Dr Churchill's alleged non-performance and awarding the Vessel to Huntington. Without a Marshal's report, the Court could not meaningfully evaluate whether the alleged default justified confirmation to Huntington or whether the irregularities required a new sale.

The irregularity is especially serious because Huntington obtained confirmation by credit bid while knowing that Morron sought appellate relief from an interlocutory order adjudicating her rights in the res and/or substitute proceeds pending appeal on the voluntariness element of salvage. A cash sale would have generated proceeds in the Court's registry. A credit bid did not. The irregular default process therefore allowed Huntington to avoid the substitute-res protection that a cash sale would have created, while attempting to obtain resale control over the Vessel through a credit bid whose amount has not been finally adjudicated and whose proceeds would be insulated from the Court's registry if Morron prevails on appeal.

*First City Nat'l Bank v. Brazosport Towing Co.*, 585 F. Supp. 115 (S.D. Tex. 1984), is instructive because the court denied confirmation where private arrangements and undisclosed bidding conduct corrupted the openness of a Marshal sale. The court found that the parties "planned to use the Marshal's auction as a sham for what was, in reality, intended by those parties to be a private sale," and held that "[c]ollusion impedes one of the primary purposes of a Marshal's sale, which is to provide a fair and open forum for all interested bidders." Id. at 118.

Here, Huntington used an unliquidated credit bid to continue bidding against the sole cash bidder until Dr Churchill's bid reached $500,000, then invoked the risk of a lower resale price as a reason to confirm the Vessel to itself rather than conduct a transparent resale. DE 313 at 2 ¶3.

Huntington's dual-track conduct is analogous to *First City* because it deprived the public of the transparency required for a fair and open judicial sale, and allowed the creditor-purchaser to benefit from an alleged default affected by its own private communications and renegotiations with the high bidder that were completely undisclosed to the Court.

That is precisely the kind of private distortion of a public Marshal sale that *First City* condemned.

**LACK OF NOTICE AND OPPORTUNITY TO BE HEARD**

Dr Churchill was the person whose alleged default supplied the factual basis for confirmation to Huntington. Yet no certificate of service indicates that he was ever served with the filings that sought to adjudicate that alleged default.

That lack of notice independently warrants post-confirmation relief.

Dr Churchill was not a stranger to the bank or the custodian or broker or the bank's attorney. He was the registered high bidder. Huntington-side participants knew how to contact him. They had his telephone number, email address, and contact information. They communicated with him about the vessel and sale both before and after the auction. Yet he was never served with the papers asking the Court to declare or rely on his default as the basis for seeking clear title to itself that would eliminate the substitute res available to other valid lien claimants.

The Court should not allow a confirmed sale to stand where the confirmation depended on the alleged default of a known high bidder who was shut out from notice and deprived of an informed opportunity to be heard regarding adverse relief that depended directly on his alleged conduct.

## HUNTINGTON SHOULD NOT BENEFIT FROM THE DEFAULT IT HELPED CREATE OR EXPLOIT

The confirmed sale rewards the party that benefited from the non-transparent default process. This is not merely Churchill's notice issue. It is Morron's sale-integrity issue because Huntington used an allegedly defective default process to obtain the Vessel by credit bid, prevent cash proceeds from entering the Court's registry, and impair Morron's appellate remedy if DE 293 is reversed.

Huntington stood to gain if the cash high bidder did not complete the sale, because confirmation by credit bid would allow Huntington to clear title, avoid competing with a cash purchaser, and later pursue a private resale outside the registry. Huntington then used the alleged default to obtain confirmation to itself by credit bid. That result eliminated the cash sale, avoided the creation of registry proceeds, and allowed Huntington to benefit from the very default process it helped create, complicate, or exploit.

Where a creditor-purchaser benefits from a high bidder's alleged default while concealing material facts concerning communications with that bidder, post confirmation relief is appropriate. The proper remedy is to restore transparency by vacating confirmation and ordering a new sale.

**A NEW SALE IS REQUIRED**

Because confirmation has already occurred, the remedy must address the lack of integrity of the prior confirmed sale.

A new sale is appropriate because:

1. Huntington relied on Dr Churchill's alleged default to obtain confirmation to itself;

2. Dr Churchill was not served before his alleged default was adjudicated or used as the basis for Huntington's sought after relief;

3. no Marshal sale report was filed and served identifying the required sale details;

4. Huntington failed to disclose repeated communications and representations made to the high bidder regarding the sale to the Court;

5. Huntington obtained confirmation by an unliquidated credit bid that has not been adjudicated in amount;

6. the sale process lacked transparency; and

7. the confirmed result benefits the party that exploited the irregularity, and prejudices Morron's potential to meaningfully recover sale proceeds pending appeal of the interlocutory order at DE 293.

The Court should vacate confirmation and order a new Marshal sale under transparent procedures, including clear bidder registration, clear deposit instructions, written receipt or rejection of deposit tenders, docketed Marshal reporting, service on registered bidders, notice and opportunity to cure before default, and disclosure of any post-auction communications concerning payment or alternate sale terms.

**REQUEST FOR EVIDENTIARY HEARING**

If not reversed *sua sponte* for the reasons set forth above, at minimum, an evidentiary hearing is warranted regarding:

1. whether a Marshal sale report was filed and served under Local Admiralty Rule E(17);

2. whether Dr Churchill was identified in any Marshal or attorney-filed report as the high bidder;

3. whether Dr Churchill was served with any sale report;

4. whether Dr Churchill was served with any notice of default;

5. whether Dr Churchill was served with Huntington's motion seeking confirmation to itself via credit bid based on his alleged default;

6. whether Dr Churchill appeared with certified funds exceeding the deposit requirement;

7. whether the Marshal refused or declined multiple certified checks;

8. what Huntington, Huntington's counsel, Huntington representatives, custodians, brokers, and sale participants communicated about alternative sale conditions to Dr Churchill after the auction;

9. whether those communications concerned payment, damage, condition, sale irregularities, or alternative purchase terms;

10. whether Dr Churchill was led away from completing payment through the Marshal;

11. whether Huntington disclosed those facts to the Court before confirmation;

12. whether confirmation by unfinalized credit bid prejudiced the integrity of the competitive bidding and sale process; and

13. whether the confirmation was procured through fraud, misrepresentation, concealment, or material irregularity.

**PRESERVATION OF RES / SUBSTITUTE RES**

Any new sale should require cash proceeds to be deposited into the Court registry pending further order. That relief is necessary because Morron's appeal concerns rights in the res and/or substitute proceeds. If Huntington is permitted to obtain title by credit bid and privately resell the Vessel outside the registry, any appellate relief on DE 293 may be impaired or rendered practically meaningless. The requested relief therefore preserves the Court's control over the judicial-sale process and protects the substitute res without requiring this Court to reconsider the voluntariness ruling presently on appeal.

**RELIEF REQUESTED**

**WHEREFORE**, movant respectfully requests that the Court enter an order:

1. **VACATING** the confirmation of sale to Huntington National Bank;

2. **FINDING** that post-confirmation relief is warranted based on fraud, misrepresentation, concealment, or at minimum, material irregularity/lack of transparency in the judicial sale process;

3. **DENYING** confirmation to Huntington under Local Admiralty Rule E(17);

4. **ORDERING** a new Marshal sale under transparent procedures;

5. **ORDERING** Huntington to disclose all communications with Dr Churchill concerning payment, deposit, sale terms, vessel condition, undisclosed damage, alleged default, post-auction negotiations, and confirmation;

6. **ORDERING** the Marshal to docket and serve a complete sale report identifying the high bidder, sale price, buyer address, deposit issue, and alleged default circumstances;

7. **ORDERING** preservation of all auction, bidder, payment, vessel-condition, default, and confirmation evidence;

8. **ORDERING** an evidentiary hearing if the Court does not immediately vacate confirmation and order a new sale;

9. **ORDERING** that any resale proceeds, including from asserted credit bids by Huntington Bank, be deposited into the Court registry pending further order;

10. **GRANTING** all other relief the Court deems just and proper.

Respectfully,

5-20-26

Danielle Morron, Movant, Pro Se
3401 SW Sawgrass Villas Dr., 11-C
Palm City, FL 34990
dmopallc@outlook.com
786-631-2495